All right. Our first case is in re Sears. We've slotted 12 minutes aside on this. I understand, it seems to LeBlanc, you've got three minutes for rebuttal. I will just say there's a chance we may go over. That's always the presider's prerogative. Don't presume it, but if you're in the middle of something and you've got a lot more to cover, you can always ask, okay? Yes, thank you. Great. So the floor is yours. You may proceed. Thank you. I'm David Blanc from LeBlanc LLP. We represent Appellant Cyrus in this matter, and I'll be arguing the common issues on behalf of the appellants. Mr. Anker, my co-counsel, represents ESL. To the extent the court had questions with respect to the fourth cause for reversal here, the ESL issue, Mr. Anker is available to answer any questions the court has. He also would deserve the right to use some of the three minutes on rebuttal to the extent that the appellant needs to raise any issues that need addressing with respect to that particular issue. But it's my intention to argue the common issues. And I'll let go of your honest comments. This is my first time in an applied courtroom, and A.T. Gunson is great, too. He offers him a beer. As for the common issue that the court faces, the question is, how should a bankruptcy court go about valuing a secured lender's collateral? And in this instance, for the purposes of determining how that collateral or whether that collateral diminished in value over the course of a bankruptcy case. Now, the code dictates, and this is Section 506.81 of the Bankruptcy Code dictates that the bankruptcy court should value that collateral, and as the Supreme Court said in Rash, with the paramount importance considering the proposed disposition for use of that collateral. That is what Justice And here, it is undisputed that what the debtor chose to do with the secured lender's collateral at the beginning of the case was to retain that collateral and to use that collateral in the course of its business. Can I ask you a question? There's no question that Sears retained the property and then used it. But there seems to be some argument about whether there was any consent by the, let's call them the 2Ls or the second-lean creditors, to them retaining and trying to dispose of that inventory because only Sears was in the position to do that. What's your statement about that? Sure. Your Honor, there was not consent for the proceeders to use our collateral without providing us what the code requires them to provide. That is adequate protection. No, but I'm not talking about what the law requires. The question is, what was going because there obviously have been sort of conflicting representations. Sears, I think, argues, and it seems to me the record bears this out in some way, that everyone, especially ESL, who was involved in trying to buy the assets, realized that Sears was the only entity in the position of trying to dispose of or sell or protect at least the value of the collateral here. So is it really accurate to say that the 2Ls didn't at least acquiesce or in some way think it was reasonable that Sears retained the property? Your Honor, I don't think that's a reasonable conclusion, and let me be clear about what it is. At the beginning of the case, the debtor made the decision to retain the collateral. They had that right under the bankruptcy code, provided they give us adequate protection. Now, they could have negotiated for something different than that. If they believed that we were better off by them retaining the collateral, they could have come to us and said, we'll settle this dispute about us retaining the collateral as long as you don't get adequate protection in place. So when the bankruptcy court said as of the petition date everyone knew that the debtors were going to dispose of substantially all of their assets in a very short time, that the only way that secured creditors would realize any value under any realistic scenario would be to quickly dispose of them either as a going concern in the sale or in the context of a complete liquidation. You're saying it's wrong. Well, I'm not saying, Your Honor, I'm not saying that's wrong. What I'm saying is that's the so-called legally relevant. Why isn't it legally relevant? The statute says what's the disposition or use going to be, and that's what the bankruptcy court said. This is the disposition or use. So it is legally relevant, right? It's different than rash and rash. They were keeping the truck. Bankruptcy court concluded here that wasn't what everybody was thinking. Everybody was thinking there was going to be a race to sell the assets, essentially. Your Honor, the part that is factually wrong about the statement you just read is the secured creditors, had the collateral been released to us, we could have easily sold that collateral. It would have taken some time. It wouldn't have yielded necessarily what Sears would have achieved in a retail sale, which is exactly what they did with our collateral, sold it in their retail stores. Well, we could have done that over time, and it would have yielded substantial value to us. In fact, the facts are undisputed that the value, the cost to Sears to acquire the collateral, just the inventory portion of our collateral, was $2.69 million. And so I think, Your Honor — So just going back to Judge Chin's question, so this was without your client's consent. They objected to this plan. They said, we want it back. Well, Your Honor, we settled the objection to that by, at the beginning of the case, by them agreeing that they would retain — us agreeing that they would retain it conditionally. Critically conditioned on them agreeing to provide a standard of protection under the bankruptcy code, as 507B requires. That means that we get exactly what Rash says we get. And, Your Honor — But doesn't that distinguish it from Rash? Because Rash was a different situation where the creditors did object, and it was a cram-down. Here, there was an objection with these protections, and then there was a process that followed. So doesn't it at least factually distinguish it for purposes of the valuation? Your Honor, an argument does not factually distinguish it or legally distinguish it. It doesn't factually — we settled the dispute over whether they could retain our collateral in a cash collateral order at the first day of the case. In Rash, they objected to the use. And ultimately, the court concluded, as the bankruptcy code provides, that Mr. Rash could keep his property and use it. And the lender there had to be provided with the full amount of its claim using replacement value as the valuation standard. It's exactly the same here. We settled the objection to the use of our collateral in return for being provided with an adequate protection claim. That adequate protection claim has to be valued pursuant to Section 506, the exact same provision that was at issue in Rash. And critically, when you see Rash, in Rash — I've read it, I'm sure Your Honor has, too, a hundred times. It's a five-page decision. You probably memorized it. Probably memorized it. I'm sure we all have. We have a fundamental disagreement about how to do Rash. Rash, we think, it presents what it describes as a sort of simple solution to this issue. But you think it's a simple solution for all scenarios? I mean, the Bankruptcy Court's a court of equity, basically, and it contemplates, you know, enormously ranging bankruptcies from a truck to a situation like this involving billions of dollars. It would seem to me that the Court basically contemplates flexibility, not rigidity. Your Honor, I think the Court could not have been more clear that with respect to the evaluation method, whether it's a replacement value or foreclosure value, it is rigid. The Court says that. Well, it can't be just sort of made up. You can't just wing it. But, I mean, certainly, Bankruptcy Courts since Rash have been applying this contrary to the way you're proposing, right? Well, Your Honor, I think that's a misreading of those cases as well. Okay. Let's start with Rescap. Rescap, perfect example. Rescap, what didn't turn on whether or not the Court should use replacement value, liquidation value, or foreclosure value? That question was foreclosed by Rash. And that's what applied to Rash, where the Court says, our reading of 506a makes plain, we rejected rules approach while in use of different valuation standards based on the circumstances of individual cases. What it does leave for discretion to the Bankruptcy Court to decide, as Bankruptcy Courts do all the time, is how you value collateral, the property that's at issue. And that's where the variation in these cases comes from. Rescap, perfect example. The issue there was there were certain mortgage servicing rights that the debtor had that were creditors' valuation. The creditors' valuation didn't consider the fact that Rescap itself was a distressed mortgage lender, didn't have the ability to issue loans. So who was going to pay anything for that mortgage servicing right when Rescap itself was a distressed entity? So when they tried to determine the replacement value, or as Rash conceived, in citing the Raffer case, the fair market value, what would a woman sell if they were a woman buyer? What the Supreme Court made clear, or I should say what the Rescap Court made clear, is you have to consider the nature of the debtor and the nature of the property that's at issue. That is exactly what comes out of Rash. But isn't that exactly what we have here? I mean, going back to Judge Bianco's statement, as the Bankruptcy Court said, everyone knew that Sears was in a distressed state and no one more than ESL, the ultimate buyer, because the head of ESL was the CEO of Sears Holdings, right? So if anyone knew about how distressed Sears' situation was, it was the two of them. But isn't that a bit of the reality that has to get injected in terms of the market value? Because distressed means the company could go pivot towards foreclosure, I mean liquidation, or a going concern. And Your Honor, that's I think the fallacy that my friends on the other side make, and that is the nature of this collateral. This is retail inventory. Value in that collateral is not a difficult exercise. Value of the awarded services rights in Rescap, difficult exercise. But the nature of this collateral to determine its replacement value, we cite the Ingram-Nuts and Bolts, a decision from the Pennsylvania Bankruptcy Court, that court, I'm sorry, the South Carolina Bankruptcy Court, that court makes clear that when you're dealing with retail inventory, the value of that is what it would cost the retailer to buy that inventory again. It's the wholesale price. That's exactly the case here. To faithfully follow Rash, the court here should have applied a replacement value and looked at the nature of this inventory and concluded that this inventory had a replacement cost equal to what the debtor had just purchased it for. This is what the debtor is in the business of doing. Buying inventory and selling it. I see my time, I've gone over my time, Your Honor. I'll reserve the remaining. Unless the court has other questions, I'll reserve the remaining. I think there may be other questions. I think there's other things that you probably wanted to get to as well. And so I don't normally let people run, you know, crashing through the red light. But I think this is a case where maybe we go over a little bit. Do you have something to add? I want to ask you about the letters of credit. We spent eight minutes on a five-page opinion, right? So I understand your argument regarding, you know, the deduction of the full amount seems perhaps not the most rational result here. But what the bankruptcy judge said was, he called it a difficult issue and basically said if the choices are zero or nine million and he didn't believe those were justified, that if you have the burden, there was no other alternative valuation that he could utilize. So why wouldn't that be not clear error? If he rejected those, it can't be zero, nine seems way too low, and I don't have another valuation and you have the burden. And he did point out there were potential other valuations that could have been proposed but were not. Okay, Your Honor, there are two responses to that. And I'll be brief. One, we don't believe that we bear the burden of the initial burden of the proof with respect to that issue. We think that if this Court should follow the decision that Herod is hiding from the Third Circuit. Can I interrupt you for one second? You can go back to Judge Bianco's question. Was the issue of burden ever raised by the appellants before the reply brief? Your Honor, I do — we obviously urge that the Court — we think we met our burden below. I don't think — I do think it was raised at least somewhat in the opening briefs, but it certainly came into focus in response to what the debtors put in there. I don't think it was raised. I don't think it was raised in the opening. Let's just assume — Yes, go ahead. I'm sorry. No, that's okay. I was going to — let's just assume that you have the burden. Why wouldn't bankruptcy be permitted to say, I don't think zero and nine are correct and there's no other alternative valuation? Your Honor, we presented substantial evidence on this very issue. In the Joint Appendix, page 4200, is the expert report of Ms. Murray in that she goes through an analysis of what those letters of credit are and concludes that they're unlikely to be drawn because 90.6 percent of them are letters of credit that relate to workers' compensation, and in the event that there was a liquidation or in the event that there was a sale in it, and what actually happened here was those letters of credit were assumed by the purchaser — Okay, but let's say that's true, but then what would the valuation be? Like 10 percent? Then, yes, you would exclude the 90 percent of them that are unlikely to be drawn. Her conclusion was that it was unlikely that any of them would be drawn, and that was the evidence that we presented. And in our view, that evidence was under-rebutted. Even if we were to burden the proof, that evidence was under-rebutted. The bankruptcy court simply ignored that. And again, we have in our reply brief, we've got a chart that lays out each of the factual recitations, the factual elements that we presented on those two issues, because I think, again, we don't think we bear the burden, but even if we do, we think there was more than that. And in fact, not only was it more than that, it was met without any evidence on the other side. And I don't think Judge Crane disagrees with that. He just concluded that we hadn't met a burden, notwithstanding the fact that we presented substantial evidence on each of those issues. In particular, as to the first one, the value of the non-farm-based inventory, obviously there's no controversy there. Both parties agreed it was worth substantial amounts of money. And with Judge Sullivan's permission, I have one question about the NBB inventory. The bankruptcy court said there's no detail in the records to what collateral was covered with respect to the debtors' overall book value valuation. What's your response to that? Sir, we presented substantial evidence of that. And in fact, the debtors' own valuation that they presented was substantially higher than what the bankruptcy court concluded here. I saw that, but I didn't see a discussion of what was being included in that, right? Well, the debtors' value, the entirety of their, they used 85 percent as a valuation. They applied that to all of the inventory, including the non-farm-based inventory. Okay. And that was including the debtors'. We also presented, the three experts on the account side presented substantial evidence of what inventory was considered in that. And we think at core, this was just a rushed job, a rushed conclusion that the court reached that didn't really consider the evidence that was presented to the tribe. But, I mean, what were you arguing to the bankruptcy court? Maybe in terms of the non-farm-based? Yeah. Yeah, Your Honor, we were arguing that it was worth, what it looked like, we were arguing that it was worth what it costs on its books to acquire. So in other words, the replacement cost of that, so that the experts each looked at books and records of the debtors. And are you still arguing that, or are you now hedging and saying it just had to be more than what the bankruptcy court concluded? Your Honor, we're still arguing that it was worth the replacement cost that RAPS requires. And on revamping, we've established that. What the bankruptcy court, both parties said it was worth, the debtors' said it was worth between $250 and $300 million. We said it was worth at least that and potentially more. The court said it was worth zero. So we're arguing that the court was wrong. So your position is, because of Mr. Griffith's testimony, the minimum amount, it should be $255 million. That's the lowest. You're saying it's like a baseball arbitration, where each side gives a number and the judge has to pick the one that's most defensible? No, Your Honor, I think the judge has to find a replacement value, and we don't think he did that. But again, what I'm saying is that even the debtors said, the debtors used $85 million, which we believe was more akin to a liquidation value or what the RAPS decision would say would be a foreclosure value, which is not appropriate. But at a minimum, in a baseball arbitration, if one party is asking for $8 million and one is asking for $12 million, and the arbitrator says you get $2 million, then that would be a basis for an appeal of that decision. And that's essentially what happened here. Well, in a baseball arbitration, presumably, I don't want to get too into baseball arbitrations, but nobody really has the burden of proof, right? You each pick a number and the judge then decides what the proof best supports. This is a situation where the burden of proof does seem to really matter. Kind of shocking to me that it's not been sort of fully developed at this point. I mean, generally, most matters in courts, the burden of proof is pretty clear, but here it's not. I think with respect to the non-borrowing-based inventory, that's a head-scratcher for us, because even if we bore the burden of proof, the debtors' own evidence valued that at least $255 million. So you couldn't say that we bore the burden of proof and didn't establish that it was worth at least that. We argue for higher than that. But at a minimum, the fact that we and the debtors both presented evidence that suggested it was worth at least that has to mean that we had a burden of proof to be at least that much. Now, again, I think the court can misapply rash, and he did the wrong analysis. But even if he did the right analysis, that's clear. Okay. All right. Thank you, Your Honor. Why don't we stop there? Thank you very much. You got your money's worth there, Mr. LeBlanc. We'll now hear from Mr. Silbert. Am I pronouncing that right? Yes, you are. Thank you very much. Good morning, and may it please the Court, I'm Frank Silbert from the Wildwood League of Hellies. I'll start with a rash issue. Rash tells us that evaluation of collateral has to be based on the actual use or disposition of the collateral. In this case, at the beginning of the bankruptcy, on the petition date, there were two facts that everyone knew about the disposition of this We would be selling all of it and not retaining any of it. And that's because selling everything, disposing of substantially all of our assets, was the only way, as Judge Ray explained, that we could generate recovery to pay our friends here at the 2Ls and our other partners. The second fact that everybody knew on the beginning of the petition date, on the bankruptcy, was that when we sold all of the 2Ls' collateral, every last piece of it, we would not be recovering full book for retail value on those settings. If you see a store that has a big sign saying everything must go, you know that store is selling at a discount. And effectively, at the beginning of the bankruptcy, Sears had a giant neon sign over not just one store, but the entire business, saying everything must go and must go fast. And so we knew, the 2Ls knew, Judge Ray knew, that it would be in no way realistic to expect the full retail or book value recovery. Can I ask you two questions? First of all, is it your position that the use or disposition language relates to what you just argued, which is how the inventory or the property was ultimately going to be used, versus what the appellants argue, which is it's just about the binary of retain or surrender? That's certainly what they argue. And the language and the decision itself suggests as much, that that's what it means when they say use or disposition. It's keep or surrender. Well, that's what it meant in RATCH, because those were the two possibilities of RATCH. But those were not realistic possibilities in this case. And in fact, you know, what RATCH tells you, if you go outside the Chapter 13 context and just look at the disposition of collateral, which says proposed use or disposition, RATCH says, what is the actual proposed use or disposition? And there was no question in anyone's mind in this case that the proposed disposition of these assets, the 2Ls collateral, was to sell all of them so that none of them would remain in Sears' hands. And everyone knew that was going to happen very, very quickly. But after they were retained by Sears. Well, I don't even, look, the disposition of collateral like this, billions of dollars in inventory, is a process that's going to take time, right? So you have to look at the completion of that process and not, you know, the first day when it starts, which is essentially what the 2Ls are asking you to do. So the 2Ls tell us that they could have sold the collateral if we had, quote, surrendered it to them. That was never a realistic option, but let's assume that it was, okay? Assume they're going to take possession of $2 billion worth of washing machines and tools and automotive parts. They're going to have to spend quite a bit of time arranging for that, right? They're going to have to have trucks to transport it. The Veritas is to put it in. They're going to have to hire thousands of employees to manage this process, do accounting and tax treatment. So if there was a, quote, surrender, again, never really on the menu here, but if they say it was, then even that, if you look, is sort of day two of the bankruptcy, you can say, well, you know, Sears packs and stuff in the stores, sure, but that's not the proposed disposition or use of collateral. The proposed disposition is, in our case, in the real world, was we were going to sell all of it and not have any of it in our hands, right? But under any scenario, day two of the bankruptcy, of course we're going to have some collateral. That's not retention in the sense that it's relevant to Ratch. In Ratch, at the end of the bankruptcy, when the dust settled, it's all said and done, Mr. Ratch had the piece of his truck in his pocket. Everybody knew that very, very soon after this bankruptcy started, and in point of fact, it was only three months into the bankruptcy that we agreed on the sale, the four months that the bankruptcy court judge approved the sale, everybody knew very quickly we would be getting rid of all of these assets and not keeping any of them in our hands. So the actual proposed disposition here, as I mentioned, was to sell it, right? And so, he appropriately valued the collateral as Ratch would strike states on that actual disposition. What could we get by selling it? And nobody but nobody thought we would actually get full book or retail value from those sales, because, as you said, Judge Chen, we are a highly distressed seller, and that is an important point that Ratch stands for, applying Ratch. When a distressed seller is selling his merchandise, you can't do a valuation that assumes full book or retail value as if it were a healthy, going, discerned, making sales in the sense we should. I think this burden question is quite important, as I believe all of you have mentioned. It's not just that the 2Ls first argued in their reply brief in this court that they had a burden, that we had a burden, or tried to shift the burden to us. What actually happened is the 2L repeatedly and expressly acknowledged in the bankruptcy court that they did have a burden. And I'd like to give you a few slides for that, if you want to hear them, because we were not able to respond to this point since it was first raised in the reply brief. But if you look at J.A. 4459, you will see testimony from ESL's counsel. He says, quote, now we have a burden of proving what our secure claim was. And if you look at J.A. 4843, this is not—I'm sorry, not testimony, but argument. This is argument from Cyrus' counsel. He is contrasting the 507B claim, the one that's before you now, with a separate surcharge claim, number 506C, a claim that the debtors were off-lead route. And Cyrus' counsel says, quote, the burden is very different. In a 507B calculation, we, that's the 2Ls, have the burden versus their, that is the debtors, having to satisfy their surcharge burden. There is also a brief. This brief is independent for some reason. It's a J.A. 399 brief. This is a joint brief by all the 2Ls. And the 2Ls say the second eight parties understand that prevailing on this motion, which is a motion to eliminate, will not believe their burden of demonstrating its actual diminution of the debts. So everybody understood. Everybody. Mr. Silva, assuming they do have that burden, I want you to turn to the letters of credit, because they would say, with respect to that, they established that the debtors didn't treat it as outstanding debt. They put on the testimony of three experts who said it should not be counted at all, including one based upon decades of experience. As they noted, Ms. Murray noted that 90 percent is not related to trade vendors. It's workers' comp, insurance, a surety bond, which, if the company is not going to continue, would obviously not be eaten up. So, in light of that evidence, why haven't they met that burden of establishing that to treat it at its full amount was clear error. So, thank you, Mr. Femke. So, first, there's no dispute that the letters of credit are senior debt. The debtor in possession orders that sort of stuff. So, everyone knows— It's contingent debt. Senior contingent debt. That's exactly right. And as to the 90 percent that the 2012 challenging period relates to workers' comp obligations, the decision to draw on those letters of credit is up to the workers' compensation boards, which have fiduciary duties to the employees. Now, Sears had tens of thousands of employees, and obviously there were substantial workers' comp liabilities. Many of those liabilities would extend out over decades. What reasoning did the bankruptcy court give for deducting the full amount, rejecting the experts? I mean, obviously he doesn't have to accept the experts, but what reasons did he give for saying they're wrong? The only thing I could find was a special appendix 28. It appears clear to me that the letters of credit would be drawn either immediately or upon their expiration date. The beneficiaries of the letters of credit would not simply let their collateral in the form of a letter of credit go away. But that's it. I think there was some more discussion along those lines in the argument. That's a conclusion, but what is that based on? It's exactly the two-step process and the two outcomes. So the first question is, would they be drawn at all? And then the second question is, if so, what now? And as to the first question, it's clear that they would be drawn, which was implied earlier, because in a liquidation scenario, in that order of liquidation value, Sears is no longer available to pay those workers' comp liabilities. The workers' comp boards have a credit-worthy source that is on the book, but the obligation is under the letters of credit. It's a very straightforward question as to whether they would be drawn at all. Are those workers' comp boards going to give up hundreds of millions of dollars of credit, or are they going to choose to access it? They're going to take it. They're not going to give away the free money. That's what Judge Gray said, and that's part of the analysis. It's exactly the part that you discussed, Judge Bianco, which is, okay, we know that the letters of credit would be drawn to some extent. So to how much? And if the 2Ls wanted to say that the letters would not be drawn in a full-face amount, they could have put on evidence. What's wrong with $9 million? Why not $9 million? $9 million is what happened at the end of the bankruptcy because DSL- I understand that, but that is an alternative number that was out there that, again, wasn't really discussed as to why that would be insufficient. You put on – there was no testimony that I think could be relied upon to suggest anything else. Mr. Griffith did- Mr. Griffith is not a liquidation expert. He said it was based upon – he's a lay witness, discussion with colleagues. I mean, that is hardly a basis to rely on, I would suggest. So, Your Honor, again, the question is, given that the 2Ls feared the burden, did they satisfy it? We don't think they satisfied it with the $9 million because the $9 million is what happened when DSL actually bought all the collateral of the rest of Sears' business. And when that happened, DSL assumed the obligation. So, there was no reason for the letters of credit to be drawn then just as there was no reason for them to be drawn on the petition case because up to the petition case, Sears was paying the workers' comp obligations. The question is, in a net orderly litigation where there's no more Sears, Sears is not paying these liabilities anymore, and these workers' comp boards have access, they have recourse to the letter of credit issues, are they going to draw the letter of credit, number one, of course? And then, number two, if so, in what amount? Well, the 2Ls' only answer was nothing or maybe $9 million because when DSL assumed the obligation, that's the amount that was drawn, but Judge Drain properly rejected both of those accounts as not based on any kind of convincing evidence. And the 2Ls did not put in anything else. So, Judge Drain had to afford him exactly the choice that you described. On the MVV inventory, it's kind of the same posture, I would suggest, but they had their experts as to how it should be valued. As was noted, Mr. Griffith suggested 85% of book value for the whole inventory, which obviously would include that, which would be $255 million. So, what would be – obviously the court doesn't have to accept, as Judge Sullivan pointed out, any of those numbers, but what was the reasoning for rejecting even Mr. Griffith's valuation? What reasoning did the bankruptcy court give? Well, the bankruptcy court did not accept Mr. Griffith's valuation of any book value. He began with Ms. Murray's valuation. Ms. Murray, like Tiger, on which she relied, did not assign any value at all to any of the ineligible inventory except for the transmittable. So, let's be clear that Ms. Murray, when she was valuing the ineligible inventory for her valuation, she submitted a report, which Judge Dragan relied on. She did not assign any value whatsoever to any of the ineligible inventory except the transmittable. Okay? And she valued that transit inventory at about $75 million, just shy of $75 million. So, the very most that Judge Dragan had to evaluate was that the ineligible inventory, to me, clear error of view, would be that. Well, what if the 2L's own experts value that? It can't be any higher than that. And that's an important break, which is somewhere between zero and seven. I don't understand why – if you, in fact, put testimony on and there's some issue with one of their experts' method of valuation, why can't they also say, well, if you don't like our expert, we suggest. You go by what Mr. Griffiths said. Why are they not allowed to do that? Well, it's not that they're allowed to be judges. This is clear error of view. And so, you have to look at whether the finding that the judge made had a basis in the record and it survived that very deferential standard review. And certainly, the argument would be that when your witness says $255 million is the valuation, that a failure to explain the reasoning for rejecting that is clear error. So the entire valuation began not with our witness, but with Ms. Berger, right? The judge only accepted Ms. Murray's top-line valuation. And Ms. Murray did not assign $255 million. She assigned $75 million. To part of it. Sorry? To part of it. To the in transit. To the rest of it, she assigned a million. The sum of all value to ineligible inventory in Ms. Murray's report was $75 million. The in transit got $75 million. The rest of it got zero. Right. But I think the point is that there's a number of different opinions. There's evidence offered. And it's not the judge has to pick one report or one expert that he agrees with, right? I mean, there's a range. There's a lot of evidence. He has to consider it all and has to then come up with a number. And he has to then defend that number or at least make sure that it's a rational number. So what's the basis for saying that the number the judge came up with here was rational based on the evidence that's in the record? None of it was reliable? No, no. There's another piece of evidence which is significant, which is that if asset-based lenders were deciding how much money they would lend to Sears based on inventory, they would not lend us any money at all based on ineligible inventory by definition. So we could not borrow one single penny based on our ownership of those assets. And what that means is those asset-based lenders were not satisfied that Sears would be able to convert those assets into cash because if they knew for sure that we could turn the assets into cash, they wouldn't want this money. But the lender said, sorry, we're not going to lend you a penny based on ineligible inventory. And then Ms. Murray, who was a one of the two experts, said, well, I'm not going to assign no value to any of these. They also cited the statement of the debtor's chief restructuring officer that suggested a 90% valuation. They said the debtor's October 2008 borrowing-based certificate lists the NBB inventory at $300 million. That's a book value. But the whole point of the NBB is the debtor's chart for a non-borrowing case. What it means is the asset-based lenders were not willing to lend us any money at all against those assets. And the reason that they're not willing to lend money against those assets is they are not going to be able to convince Sears to be able to turn those assets into cash. That's the whole point of the NBB. So, obviously, it has some significant discount. Judge Sullivan, you asked the two of us today, was your position growth some value over zero, or was it holdover retail value? And I believe my friend on the other side answered holdover retail value. And, again, they have the burden, and it certainly is subject to some very significant discount. It has to – the range, when we're doing a fair review, has to be between zero, which is what Judge Raines found, and what the asset-based lenders were willing to subscribe to it, and 75, which is what the two of us actually gave them. It can't be any more than 75. And that's significant because even if you added $75 million to the valuation of the collateral on petitioning, the 2Ls still got more value from their collateral than they were entitled to when you factored the credited. You remember that the credited was over $433 million. That was all based on the valuation of the collateral. What Judge Raines found was the 2L's residual interest in the collateral on the petitioning was something like $250 – I guess $170 million, right? So when you subtract the credited, they got more value than they were entitled to already, not less. And that would still be true even if you added the entire $75 million valuation in eligible inventory that Ms. Murray proposed. So we think a clearer range before you is between zero and 75. And even if you went to the very high end of that range, it would not change the outcome of this case at all. All right. Okay. Thank you, Mr. Silbert. Thank you. Mr. LeBlanc, you've got three minutes or so. Yes. Thank you, Your Honor. And I want to focus my reply, at least at the beginning, on the Rasch question. The court, like, faced with the question of how to value the collateral, had to choose what the debtors – had to identify what the debtors had done and then choose how to value the collateral based upon that. We have not identified – they've not cited, we've not found a single case that hasn't, after Rasch, used a replacement value method. When the debtor chooses to retain the collateral. That is true in every context. There's no case that says Rasch is limited to a Chapter 13 case or is limited to a cram-down scenario. There are legions of cases that say it applies with equal force to a Chapter 11 case, which this was, and it applies with equal force to the determination of an adequate protection claim. Well, I mean, does, I guess, footnote 6 of Rasch suggest that replacement value is, you know, more expansive or broad than you're giving it credit for? Your Honor, it gets back to what we talked about. There – and I think the Knutson-Boltz case is a good example of this, where the court says – and, in fact, you can even look at what Congress did in 2005 in adopting 506-82, where the court said in some circumstances you might need to use retail value. In some circumstances you might use wholesale value. That's the point of it. And if there was a circumstance where the goods themselves were damaged, you have to value them as damaged goods. So in the case of Mr. Rasch's truck, it had to be valued with all its dents and bumps and all of its problems. So your position is even if there was consent and even if the assets were immediately going to be sold, you still would use replacement value. Is that your position?  Your Honor, we think that the debtor's decision to retain the collateral in return for providing us with adequate protection, there is no case that says in that circumstance that the debtor retains the collateral, that the – Retains for the purpose – but it could be retains for the purpose of immediately selling. Well, Your Honor, to be clear, that's point two that I want to make. The actual use by the debtors of our collateral in this case was not an immediate liquidation of those assets. The actual use of our collateral was a going concern operation by the debtors. That's what they actually did. They continued to operate their stores. They used that property to generate a stream of income. I thought the bankruptcy court did value part of it as a going concern. Or am I misunderstanding? No, Your Honor. He chose a number. He did what the Seventh Circuit had done in pockets, that the rash court overturned. He picked a number between a full foreclosure value and a value that was based on replacement value. He put it in different terms, liquidation value. But, Your Honor, the simple reality was when the debtor made the election to retain the collateral, they chose to continue to operate as a going concern retail. And they sold our collateral. They didn't sell it at replacement value. They sold it at a higher retail price. So they earned money by doing it. That was their election. That election comes with the consequence that they have to compensate us with replacement value. That is the trade that a debtor has to make. That's what rash says the court needs to do, is if the debtor chooses to retain the collateral for the purpose of generating an income, that has a consequence. And that is that it needs to then compensate the creditor who doesn't have the use, as they would under state law, doesn't have the use of their collateral. It needs to compensate them with replacement value. That is exactly how the court should interpret rash. In fact, it's the way that every other court has done it. Heritage Highgate, again, not with respect to Burmish, but with respect to this same issue, Heritage Highgate talks to using rash in the Chapter 11 for adequate protection purposes. It's exactly the same issue. Your Honor, I know my time has expired. I'm happy to address any issues on the other two points. The non-barter is collateral. Just very, very briefly on that. The fact that it wasn't part of the borrowing base for the first-name lenders to lend against, in no way, shape, or form suggests that it doesn't have value. There's no question about that. They value it at substantial dollars. It is irrelevant to the analysis. The fact that the lenders wouldn't lend against it meant that the lenders had more collateral to support the loans that they did. What about that Ms. Murray only valued it at $76 million or whatever it was? Ms. Murray only valued a portion of the collateral. In her own analysis, she said this is the floor for the adequate protection claim. She only valued a portion of the collateral. There's a portion of it she simply didn't value. She didn't ascribe no value to it. The other two experts and their own witnesses ascribed a value to that category of non-barter-based inventory that was not in transit inventory. Ms. Murray just didn't find something that she could point to to put a number against it, so she didn't ascribe a zero value. She just didn't do the exercise. The other experts and their own witnesses did. So what are you asking us to do then? Send it back to Judge Drain to do what? We think you have to send it back to Judge Drain. You should reverse and bring it back to Judge Drain for a determination of the adequate protection claim here, of the spirit lenders claim. So you're not saying we should go with what you were pitching to Judge Drain. You're saying that Judge Drain should come up with a different number, but it shouldn't be any lower than what the debtors' experts said. No, Your Honor. Well, that is true, but I don't think that's the end of the analysis. What we think Your Honor should do is we think you should conclude that the judge had to apply replacement value to determine value of collateral. They concede he didn't do that. That's not what he did. But maybe I'm assisting. Did anyone provide that information to Judge Drain? Absolutely, Your Honor. You're saying your experts calculated replacement value using their methodology. All right. Go ahead. They did. And, Your Honor, that – but you didn't – Judge Drain used a different analysis. So he didn't ascribe a number to if I use replacement value, this is the outcome. So we do think it's a remand to Judge Drain. We think there's evidence in the record that could support Your Honor's reaching a conclusion because the collateral, just the inventory portion of our collateral, was purchased by the debtors for more than the full amount of it. But even if we disagree with you on that point, even if we disagree with you on the replacement value issue, you would be asking us to send it back because you think the other errors could – would add up potentially to $246 million and, therefore, provide a claim. Is that – The other two issues standing alone, even if you use the low-income bear value range with the letters of credit, $655 million. And so those issues standing alone – Depending on how those get resolved, you could hit 246. Even if you don't get replacement value. Correct, Your Honor. And obviously, if we do, then the numbers – we're obviously limited by the amount of our claim, which is approximately $718 million that we were left unpaid. But those two issues standing alone are enough to make it not a harmless error if you agree with us that it was, in fact, an error. So we would urge that the court remand the magnitude of that claim for consideration in light of what we think is a clear mistake in the application of RASH and is clear error with respect to the other two issues that we've raised on the field. Meaning the MBB and the credit – letters of credit. Yes, Your Honor. And I know Mr. Aker hasn't spoken, but obviously, he's resting on his fingers with respect to the ESL issues alone, which the court would have to decide as well. So my general worry about this remand proposal is that what you're saying is this would encourage or incentivize people to go for broke in front of the bankruptcy court. And then if you lose, you run to the court of appeals and say that we should get another bite of the apple because it should be something higher than what the two sort of extreme offers were. I mean, in the baseball analogy, it's sort of saying if you lose on yours, you get to ask the judge to go back and find a midpoint. Your Honor, I don't think that's what we're asking at all. We presented replacement value. Right. Okay. So if we send this back and don't agree with you on RASH, then what are you arguing in front of Judge Drain? Well, if you reverse him with respect to the determination as to the letters of credit and the non-borrowing base, if you don't reverse him with respect to his value of the collateral, the RASH issue, then we're arguing that we presented sufficient evidence that he – we're arguing, as we did – and to answer a question Your Honor asked earlier, we did argue pertinent proof in our reply papers in the district court below. That's – it's in our reply brief in the district court below. I have the document that I can get to the court in a second. But the – Your Honor, he misconstrued – he committed clear error. And it's not as though – we don't want to present additional evidence that we think we presented more than sufficient evidence. So you're not going to – it's not going to open up the record? We don't think it has to, Your Honor. We think he has to decide on the record. But he could also provide additional reasoning, potentially, to justify the numbers that he gave. That is not another possibility. Well, that's the only – that's what you're proposing, right? Well, and that is what we're proposing. We're proposing a remand where Judge Drain decides the issue. We don't need the record to be open. We think the record is clear. And Judge Yoffe, you're right. He could reach the same decision. So even though Mr. Griffith said $255 million or whatever it is, he could explain. I didn't think Mr. Griffith was right either, right? He could certainly do that, Your Honor. What's clear is – and I think Your Honor has faced this all the time – is where a prior fact makes a clear error. Asking for the remand is not asking for a second bite of the apple. It's asking for the court alone to do what it should have done, which is to properly weigh the evidence. And in this instance, it's clear to us that he didn't properly weigh the evidence with respect to those issues. And this is why, Your Honor. Thank you, Your Honor. I appreciate the accommodation as well. No, no. Thank you all. It's a pleasure to have you here. Well argued, well briefed. We will reserve the decision, of course. We'll now move on.